DSS:EMN/AH/DAL/BDM
F.#2013R01206

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ NOV 2 5 2013 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

CHARLES BLAZER,

          Defendant.

I N F O R M A T I O N

Cr. No. 13-602 (RJD)
(T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(b), 1349, 1956(h),
1962(d), 1963, 1963(a),
1963(m) and 3551 et seq.; T.
21, U.S.C., § 853(p); T. 26,
U.S.C., § 7201; T. 28,
U.S.C. § 2461(c); T. 31,
U.S.C. §§ 5314 and 5322(b))

- - - - - - - - - - - - - - - X

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION TO ALL COUNTS

      At all times relevant to this Information, unless otherwise indicated:

I.   The Enterprise

      1.   The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation

("AFC") and the Oceania Football Confederation ("OFC") - together with affiliated regional federations, national member associations and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise").  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2.    The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide.  The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions and commercializing the media and marketing rights associated with the sport.  The members of the enterprise, as well as individuals employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions.

A.    FIFA

3.    FIFA was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was composed of as many as 208 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa and the United States Virgin Islands following suit in the 1990s.  At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA has maintained a development office since at least 2011.

4.    FIFA's member associations were also each a member of one of the six continental confederations recognized by FIFA: CONCACAF, CONMEBOL, UEFA, CAF, AFC and OFC.  Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3

5.      FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body.  FIFA also had a president, who represented the association worldwide and was responsible for the implementation of decisions.  FIFA also operated several standing committees, including a committee that organized Olympic soccer qualifying tournaments, whose members included soccer officials from various national member associations. FIFA also operated through a number of subsidiaries, including subsidiaries that assisted with FIFA's media and marketing activities.

6.      The FIFA congress was composed of delegates from each of its member associations, as well as observers appointed by each of the confederations.  Among other things, the congress was responsible for amending FIFA's statutes and electing the FIFA president.  The congress convened in ordinary sessions biennially or annually, and at other times in extraordinary sessions, in various countries around the world, including the United States.

7.      The FIFA executive committee, often referred to as the "ExCo," was composed of the FIFA president and 23

4

ordinary members, some of whom also held the title vice president. The president was elected by the FIFA congress. The vice presidents and ordinary members were appointed by the confederations. Each confederation was entitled to appoint a specific number of vice presidents and ordinary members, as set forth in the FIFA statutes. Since at least 1996, the executive committee was required by FIFA statutes to meet at least twice per year. The executive committee held meetings at FIFA's headquarters in Zurich, as well as in various countries around the world, including the United States.

8.      Among other duties, the executive committee was responsible for selecting the host nations of FIFA tournaments, including, among others, the World Cup, the Women's World Cup, the Confederations Cup, the Under-20 World Cup, the Under-20 Women's World Cup, the Under-17 World Cup, the Under-17 Women's World Cup and the Club World Cup.

9.      The World Cup, the sport's premier event, was a quadrennial international tournament involving the senior national men's teams of 24 and, beginning in 1998, 32 nations. In selecting the host nation for the World Cup, the executive committee typically followed a process in which bid committees for the competing nations campaigned for votes among the members of the executive committee. Following this process, and at

5

least six years prior to each World Cup, the executive committee typically held a vote in which its members cast their vote via secret ballot.  The winners, or host nations, for the World Cups from 1990 to 2022, as well as the other nations that were still under consideration by the executive committee at the time of the vote, are reflected in the table below:

| World Cup | Date Selected by the ExCo | Winning Nation | Other Bidding Nation/Nations |
|---|---|---|---|
| 1990 | May 19, 1984 | Italy | Soviet Union |
| 1994 | July 4, 1988 | United States | Morocco Brazil |
| 1998 | July 2, 1992 | France | Morocco |
| 2002 | May 31, 1996 | Japan/South Korea | - |
| 2006 | July 6, 2000 | Germany | South Africa England Morocco |
| 2010 | May 15, 2004 | South Africa | Morocco Egypt |
| 2014 | October 30, 2007 | Brazil | - |
| 2018 | December 2, 2010 | Russia | Spain/Portugal Netherlands/Belgium England |
| 2022 | December 2, 2010 | Qatar | United States South Korea Japan Australia |

10.  Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply

with and enforce FIFA's statutes, regulations and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

11. FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations. FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup. For the 2007-2010 financial period, FIFA had total revenues of $4.189 billion, 83% of which ($3.480 billion) was attributable to the sale of television and marketing rights to the 2010 World Cup. FIFA's profits during this same period were $631 million. FIFA, in turn, helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program and the Goal Program.

B.   The Continental Confederations

12. In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis. The leaders and representatives of the confederations conducted business with one another, as well as with the leaders

and associates of FIFA, throughout the year at locations around the world, including in the United States.  Each confederation was governed by its own congress, general secretariat, executive committee and standing committees.  From time to time, some of the confederations, like FIFA, also operated through subsidiaries, including subsidiaries that assisted with media and marketing activities.

13.  CONCACAF was a continental soccer confederation incorporated, since 1994, as a non-profit corporation in Nassau, Bahamas.  CONCACAF was comprised of as many as 40 member associations, including the United States, Puerto Rico and the United States Virgin Islands, representing organized soccer in North America, Central America, the Caribbean and three South American countries.  The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.  While the confederation president maintained an office in Trinidad and Tobago, CONCACAF's principal administrative office was located in New York, New York, where the general secretary was based and where CONCACAF regularly conducted business.  CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation.  Among other tournaments,

8

CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league – or club – teams.

14. CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asuncion, Paraguay and, later, Luque, Paraguay. CONMEBOL was comprised of as many as 10 member associations, representing organized soccer in South America. Among other tournaments, CONMEBOL organized the Copa America, featuring the men's national teams of its ten members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams.

15. UEFA was a continental soccer confederation registered as a legal entity under the laws of Switzerland and headquartered in Nyon, Switzerland. UEFA was comprised of as many as 53 member associations, representing organized soccer in Europe and certain nations in the Middle East and Central Asia. Among other tournaments, UEFA organized the European Championship, featuring the top men's national teams, as well as tournaments featuring the top men's club teams.

16. CAF was a continental soccer confederation headquartered in Cairo, Egypt. CAF was comprised of as many as

56 member associations, representing organized soccer in Africa. Among other tournaments, CAF organized the Africa Cup of Nations, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

17. AFC was a continental soccer confederation registered as a legal entity under the laws of Malaysia and headquartered in Kuala Lumpur, Malaysia. AFC was comprised of as many as 47 member associations, representing organized soccer in Asia, as well as on the island of Guam, a territory of the United States. Among other tournaments, AFC organized the Asian Cup, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

18. OFC was a continental soccer confederation incorporated under the laws of New Zealand and headquartered in Auckland, New Zealand. OFC was comprised of as many as 15 member associations, representing organized soccer in New Zealand and the Pacific Island countries, including American Samoa, a territory of the United States. Among other tournaments, OFC organized the Nations Cup, a tournament founded in 1996 featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

19. The confederations also organized World Cup qualifying matches, using a variety of formats.

C.    The Regional Federations and National Associations

20.   In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

21.   For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF") and the North American Football Union ("NAFU").  The United States Soccer Federation was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

22.   The national associations promoted, organized and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States was the United States Soccer Federation, which was based in Chicago, Illinois.

23.   The national associations worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level. Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as other venues worldwide.

D.   <u>The Sports Marketing Companies</u>

24.   FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies and other events, as well as other rights associated with the sport.  These sports marketing companies, including multinational corporations with headquarters, offices or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights and ticketing rights.  These sports marketing companies often sold these rights to, among others, television and radio stations, sponsors and sub-licensees, including those located in the United States.

25.   The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for the enterprise.

12

## II.   The Defendant

26.   The defendant CHARLES BLAZER was an individual employed by and associated with the enterprise.  In or about and between April 1990 and December 2011, BLAZER was employed as the general secretary of CONCACAF.  BLAZER, a United States citizen, resided in New York, New York, where he oversaw CONCACAF's principal administrative office and staff.  Beginning in or about February 1997, BLAZER was also a member of FIFA's executive committee, serving as one of the three members of that body who had been appointed by CONCACAF and the only member who represented the United States.  At various times, BLAZER was also a member of various FIFA standing committees, including the marketing and television committee.

27.   BLAZER was compensated for his position as CONCACAF's general secretary by a number of methods, including an annual fee and a revenue-based commission structure that he designed.  BLAZER was also compensated for his position as a member of FIFA's executive and marketing committees.  BLAZER elected to receive this compensation in various accounts, including accounts based in the United States and in offshore banking jurisdictions.

28.   As an official of CONCACAF and FIFA, BLAZER was bound by fiduciary duties to the two organizations.

### III. The Conspirators' Corruption of the Enterprise

29.   Certain individuals employed by and associated with the enterprise, including the defendant CHARLES BLAZER, conspired with one another to use their positions within the enterprise to enrich themselves through schemes involving the offer, acceptance, payment and receipt of undisclosed and illegal payments, bribes and kickbacks, as well as through other money-making schemes such as unauthorized World Cup ticket sales.  Though they also helped pursue the principal purpose of the enterprise, BLAZER and his co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery and money laundering, in pursuit of personal gain.  BLAZER and his co-conspirators corrupted the enterprise by abusing positions of trust, engaging in undisclosed self-dealing, misappropriating funds and violating their fiduciary duties.  To further their corrupt ends, BLAZER and his co-conspirators provided each other with mutual aid and protection.

30.   The conspirators engaged in conduct designed to prevent detection of their illegal activities, to conceal the location of proceeds of those activities, and to promote the carrying on of those activities.  That conduct included, among other things: the use of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms,

14

including trusted intermediaries, bankers, financial advisors and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice. Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

IV. <u>The Criminal Schemes</u>

31. In furtherance of the conspiracy and to effect its objects, the defendant CHARLES BLAZER, together with others, conspired to engage in multiple schemes, including schemes involving: (a) the offer, acceptance, payment and receipt of undisclosed and illegal payments and bribes in connection with votes of the FIFA executive committee to determine the host nation for World Cup tournaments; and (b) the offer, acceptance, payment and receipt of undisclosed and illegal payments, bribes and kickbacks in connection with contracts between CONCACAF and a sports marketing company involving the media and marketing

rights associated with CONCACAF's Gold Cup tournament.  Three
such schemes are described below:

A.   1998 World Cup Vote Bribery Scheme

32.  In or about 1992, the FIFA executive committee
considered bids from Morocco and France, as well as a third
nation that withdrew before the vote, to host the 1998 World
Cup.  In the months before the vote, BLAZER traveled with Co-
Conspirator #1, an individual whose identity is known to the
United States Attorney, to Morocco at the invitation of the
Moroccan bid committee.  At the time, Co-Conspirator #1 held a
number of positions in soccer, including high-ranking positions
with FIFA and CONCACAF.

33.  While in Morocco, BLAZER was present when a
representative of the Moroccan bid committee offered a bribe
payment to Co-Conspirator #1 in exchange for Co-Conspirator #1's
agreement to cast his secret ballot on the FIFA executive
committee for Morocco to host the 1998 World Cup.  Co-
Conspirator #1 accepted the offer.

34.  After the trip, Co-Conspirator #1 directed BLAZER
to contact representatives of the Moroccan bid committee to
determine when the payment would be made.  BLAZER thereafter
spoke with representatives of the Moroccan bid committee on
several occasions, including by telephone from the CONCACAF

16

offices in New York, New York, regarding when the payment would be made.

35.    Though the payment was made, at FIFA's executive committee meeting held on July 2, 1992, France was selected over Morocco to host the 1998 World Cup.

36.    No disclosure of this bribery scheme was made to the FIFA or CONCACAF executive committee or congress.

B.    <u>CONCACAF Gold Cup Contract Bribery and Kickback Scheme</u>

37.    In or about 1991, CONCACAF began organizing and promoting the Gold Cup, a tournament featuring the member nations of CONCACAF and, in certain years, those of other confederations.  As general secretary of CONCACAF, BLAZER was responsible for negotiating a contract to sell the media and marketing rights associated with the tournament.  In connection with the first Gold Cup tournament, BLAZER, on behalf of CONCACAF, entered into such a contract with a media company based in Mexico.

38.    In or about 1993, BLAZER and Co-Conspirator #1 entered into negotiations with Co-Conspirator #2, an individual who ran a sports marketing company that was headquartered in South America and had an affiliate in the United States (individually and collectively, "Company A").  The identities of Co-Conspirator #2 and Company A are known to the United States

Attorney.  During the course of negotiations, Co-Conspirator #2 offered to pay a six-figure sum of money personally to BLAZER and Co-Conspirator #1 as a bribe and kickback for their agreement to award the contract for the media and marketing rights to the Gold Cup to Company A.  BLAZER and Co-Conspirator #1, who was a high-ranking CONCACAF official at all times relevant to this scheme, accepted the offer and caused CONCACAF to enter into a contract with Company A in or about October 1994.

39.  Beginning with the 1996 Gold Cup and continuing for four subsequent editions of the tournament (1998, 2000, 2002 and 2003), pursuant to the contract with Company A (as subsequently amended and renewed following additional negotiations), CONCACAF granted to Company A, among other things, television and radio rights to the Gold Cup, as well as revenue from the sale of tickets to the tournament.  The negotiations between CONCACAF and Company A were conducted over the telephone and in person in New York, New York, Los Angeles, California, and Miami, Florida, among other places.

40.  During this period, Co-Conspirator #2 and other representatives of Company A caused hundreds of thousands of dollars in bribe and kickback payments to be wired into accounts controlled by BLAZER in multiple wire transfers.  The payments

were wired from accounts held in the name of entities other than
Company A to disguise the source and nature of the funds.  The
payments were wired to entities BLAZER controlled, such as
Sportvertising, a Cayman Islands corporation, to further
disguise the source and nature of the funds.  One such wire
transfer is described below:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| March 29, 1999 | Wire transfer of $200,000 from an account in the name of Company B, a Uruguayan company, the identity of which is known to the United States Attorney, with ties to Company A, at a bank in Montevideo, Uruguay to a Barclays Bank PLC correspondent account in New York, New York, for credit to BLAZER's Sportvertising account ("the Sportvertising Cayman Account"), at Barclays Bank PLC in the Cayman Islands |

41.  In February 2003, following the receipt of
another such wire transfer, in the amount of $600,000, which was
also credited to the Sportvertising Cayman Account (then held at
FirstCaribbean International Bank (Cayman) Limited, a successor
to Barclays Bank PLC), BLAZER received a letter from his bank
asking that he provide the source of funds, along with
supporting documents.  BLAZER forwarded the letter via email to
Co-Conspirator #2's secretary, saying "we will need to construct
a contract regarding this and other transfers" and asking that

the letter be provided to Co-Conspirator #2.  BLAZER subsequently received a backdated "Consulting Services Agreement" purporting to be between Sportvertising Ltd. and Company C, a Panamanian corporation, the identity of which is known to the United States Attorney, with ties to Company A, and provided the agreement to his bank in the Cayman Islands.

42.  On multiple occasions, BLAZER, acting pursuant to his understanding with Co-Conspirator #1 that the payments BLAZER received from Co-Conspirator #2 and Company A would be divided between them, shared portions of the bribe and kickback payments he received with Co-Conspirator #1.  For example, on or about April 23, 1999, shortly after he had received $200,000 from Company A via Company B, as described above, BLAZER sent a wire transfer from his Sportvertising Cayman Account in the amount of $100,000 to a bank account controlled by Co-Conspirator #1.

43.  No disclosure of this bribery and kickback scheme was made to the CONCACAF executive committee or congress.

C.    2010 World Cup Vote Bribery Scheme

44.  In or about 2004, the FIFA executive committee considered bids from Morocco, South Africa and Egypt, as well as other nations that withdrew before the vote, to host the 2010 World Cup.

45.   In the months before the vote, BLAZER and Co-Conspirator #1 traveled to Morocco as they had done previously. At the time, Co-Conspirator #1 held a number of positions in soccer, including as a high-ranking official of FIFA, CONCACAF and CFU.

46.   While in Morocco, a representative of the Moroccan bid committee offered to pay $1 million to Co-Conspirator #1 in exchange for his agreement to cast his secret ballot on the FIFA executive committee for Morocco to host the 2010 World Cup.

47.   Subsequently, BLAZER learned from Co-Conspirator #1 that representatives of FIFA, the South African government and the South African bid committee were prepared to arrange for the government of South Africa to pay $10 million to a soccer organization controlled by Co-Conspirator #1 to "support the African diaspora."  BLAZER understood the offer to be in exchange for the agreement of Co-Conspirator #1, BLAZER and Co-Conspirator #3, whose identity is known to the United States Attorney, to all vote for South Africa, rather than Morocco, to host the 2010 World Cup.  At the time, Co-Conspirator #3 was a high-ranking official with FIFA and CONCACAF.  Co-Conspirator #1 indicated that he had accepted the offer and told BLAZER that he

would give a $1 million portion of the $10 million payment to BLAZER.

48.   In FIFA's executive committee vote held May 15, 2004, South Africa was selected over Morocco and Egypt to host the 2010 World Cup.  BLAZER, Co-Conspirator #1 and Co-Conspirator #3 indicated that they voted for South Africa.

49.   In the months and years after the vote, BLAZER would periodically ask Co-Conspirator #1 about the status of the $10 million payment.

50.   At one point, BLAZER learned that the South Africans were unable to arrange for the payment to be made directly from government funds.  Arrangements were thereafter made with FIFA officials to instead have the $10 million sent from FIFA – using funds that would otherwise have gone from FIFA to South Africa to support the World Cup - to a soccer organization controlled by Co-Conspirator #1.

51.   BLAZER finally learned from a high-ranking FIFA official that FIFA had in fact sent Co-Conspirator #1 the $10 million.  Though years had passed since the vote, BLAZER, acting pursuant to their common scheme and understanding, told Co-Conspirator #1 that he wanted his portion of the money.  Co-Conspirator #1 agreed to give BLAZER the money but stated that he would have to pay him in installments as he had already spent

it.  Co-Conspirator #1 also disclosed that he had given two smaller portions of the money to Co-Conspirator #3 and another soccer official.

52.  From in or about December 2008 to in or about May 2011, BLAZER received three payments from Co-Conspirator #1, totaling over $750,000.

53.  The first payment, in the amount of $298,500, was made by wire transfer sent on or about December 19, 2008 from an account held in the name of CFU in a bank in the Caribbean, to a Bank of America correspondent account in New York, New York, for credit to BLAZER's Sportvertising Cayman Account.

54.  The second payment, in the amount of $205,000, was made by check drawn on an account held in the name of CFU in a bank in the Caribbean.  On or about September 27, 2010, BLAZER caused the check to be deposited into his Merrill Lynch brokerage account in New York, New York.  Approximately one month earlier, on or about August 23, 2010, Co-Conspirator #1 sent an email to BLAZER to advise him that the payment was forthcoming.

55.  The third payment, in the amount of $250,000, was made by check drawn on an account held in the name of CFU in a bank in the Caribbean.  The check was delivered to BLAZER by another individual who traveled by airplane from Trinidad and

23

Tobago to John F. Kennedy International ("JFK") Airport in Queens, New York, and then to CONCACAF's headquarters in New York, New York, where he delivered the check to BLAZER.  A representative of FirstCaribbean International Bank in the Bahamas, where BLAZER held another account, subsequently traveled by airplane to New York, landing at JFK Airport.  After arriving, the bank representative traveled to New York, New York, where he took custody of the check.  He subsequently traveled to the Bahamas and, on or about May 3, 2011, deposited the check into BLAZER's account.  Approximately two months earlier, on or about March 13, 2011, Co-Conspirator #1 sent an email to BLAZER to advise him that the payment was forthcoming.

56.  BLAZER never received the balance of the promised $1 million payment.

57.  No disclosure of this bribery scheme was made to the FIFA or CONCACAF executive committee or congress.

### COUNT ONE
(Racketeering Conspiracy)

58.  The allegations contained in paragraphs 1 through 57 are realleged and incorporated as if fully set forth in this paragraph.

59.  In or about and between April 1990 and December 2011, both dates being approximate and inclusive, within the

24

Eastern District of New York and elsewhere, the defendant CHARLES BLAZER, together with others, being a person employed by and associated with the enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

60. The pattern of racketeering activity through which the defendant CHARLES BLAZER, together with others, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise consisted of multiple acts indictable under:

    (a) Title 18, United States Code, Section 1343 (wire fraud, including honest-services wire fraud);

    (b) Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy);

    (c) Title 18, United States Code, Section 1952 (interstate and foreign travel in-aid-of racketeering); and

    (d) Title 31, United States Code, Sections 5314 and 5322 (willful failure to file report of foreign bank and financial accounts);

25

and multiple acts involving bribery, in violation of New York
State Penal Law Sections 180.03 and 180.08.  BLAZER agreed that
a conspirator would commit at least two acts of racketeering
activity in the conduct of the affairs of the enterprise, the
last of which would occur within 10 years of a prior act of
racketeering activity.

　　　　(Title 18, United States Code, Sections 1962(d), 1963
and 3551 et seq.)

### COUNT TWO
(Wire Fraud Conspiracy)

　　　　61.  The allegations contained in paragraphs 1 through
57 are realleged and incorporated as if fully set forth in this
paragraph.

　　　　62.  In or about and between April 2004 and May 2011,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant CHARLES
BLAZER, together with others, did knowingly and intentionally
conspire to devise a scheme and artifice to defraud FIFA and
CONCACAF, including to deprive FIFA and CONCACAF of their
respective rights to honest and faithful services through bribes
and kickbacks, and to obtain money and property by means of
materially false and fraudulent pretenses, representations and
promises, and for the purpose of executing such scheme and

26

artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: emails, telephone calls and wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Money Laundering Conspiracy)

63.   The allegations contained in paragraphs 1 through 57 are realleged and incorporated as if fully set forth in this paragraph.

64.   In or about and between December 2008 and May 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CHARLES BLAZER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers and checks, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United

States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNTS FOUR THROUGH NINE
(Income Tax Evasion)

65. On or about the dates set forth below, within the Southern District of New York and elsewhere, the defendant CHARLES BLAZER, a resident of New York, New York, did knowingly and willfully attempt to evade and defeat substantial income tax due and owing by him to the United States of America for each of the calendar years set forth below, by failing to file a United States individual income tax return with the Internal Revenue Service ("IRS") as required by law, failing to pay to the IRS income tax and engaging in affirmative acts of evasion,

including concealing and attempting to conceal from the IRS his true and correct income.

| Count | Calendar Year of Tax Return | Due Date of Tax Return |
|-------|------------------------------|-------------------------|
| Four  | 2005 | April 17, 2006 |
| Five  | 2006 | April 17, 2007 |
| Six   | 2007 | April 15, 2008 |
| Seven | 2008 | April 15, 2009 |
| Eight | 2009 | April 15, 2010 |
| Nine  | 2010 | April 18, 2011 |

(Title 26, United States Code, Section 7201; Title 18, United States Code, Sections 3551 et seq.)

COUNT TEN
(Willful Failure to File Report of
Foreign Bank and Financial Accounts)

66.   At all times relevant to Count Ten:

a.   Pursuant to Title 31, Code of Federal Regulations, Sections 103.24, 103.27(c), 103.27(d) and 103.59(b), citizens and residents of the United States who had a financial interest in, or signature authority over, a bank, securities and other financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the United States Department of the Treasury a Report of Foreign Bank and Financial Accounts on Form TD-F 90-22.1 (the "FBAR").

b.    The FBAR for a given year was due by June 30 of the following year.

67.   During the calendar year 2010, the defendant CHARLES BLAZER, a resident of New York, New York, had a financial interest in, and signature and other authority over, one or more financial accounts, having an aggregate value exceeding $10,000, at FirstCaribbean International Bank, a bank in the Bahamas.

68.   On or before June 30, 2011, within the Eastern District of New York and elsewhere, the defendant CHARLES BLAZER did knowingly and willfully fail to file with the United States Department of the Treasury a Report of Foreign Financial and Bank Accounts on Form TD-F 90-22.1, disclosing that he had a financial interest in, and signature and other authority over, a bank, securities and other financial account in a foreign country, to wit: a Bahamanian bank account at FirstCaribbean International Bank, which account had an aggregate value of more than $10,000 during the year 2010, while violating another law of the United States, to wit: Title 26, United States Code, Section 7201.

(Title 31, United States Code, Sections 5314 and 5322(b); Title 18, United States Code, Sections 3551 et seq.)

30

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

69.  The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 1963(a), which requires any person convicted of such offense to forfeit: (a) any interest acquired or maintained in violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, and (c) any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

70.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        (a)  cannot be located upon the exercise of due diligence;

        (b)  has been transferred or sold to, or deposited with, a third party;

31

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendant, including but not limited to the defendant's pension from FIFA, up to the value of the forfeitable property.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

71.   The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offense.

72. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, including but not limited to the defendant's pension from FIFA, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

73.   The United States hereby gives notice to the
defendant that, upon his conviction of the offense charged in
Count Three, the government will seek forfeiture in accordance
with Title 18, United States Code, Section 982(a)(1), which
requires any person convicted of such offense to forfeit any and
all property, real or personal, involved in such offense, or any
property traceable to such offense.

74.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due
diligence;

(b) has been transferred or sold to, or deposited
with, a third party;

(c) has been placed beyond the jurisdiction of
the court;

(d) has been substantially diminished in value;
or

(e) has been commingled with other property which
cannot be divided without difficulty;
it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), as incorporated by Title 18,

34

United States Code, Section 982(b), to seek forfeiture of any other property of the defendant, including but not limited to the defendant's pension from FIFA, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

35