<u>UNSEALED</u>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

                 - against -

CHARLES BLAZER,

                       Defendant.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

13 CR 602 (RJD)

RAYMOND J. DEARIE, United States District Judge:

        The government's investigation into employees and associates of the Fédération Internationale de Football Association ("FIFA") has invited a vast amount of worldwide press attention.  Presently before the Court are the applications of five non-party members of the media, requesting that defendant Charles Blazer's plea agreement with the government be unsealed.  The government opposes these applications.  Because the Court concludes that the government has not met its high burden of establishing that continued sealing is necessary to prevent a substantial probability of prejudice to a compelling government interest, the applications to unseal the agreement are granted.

<u>BACKGROUND</u>

        On November 25, 2013, in a sealed proceeding, Blazer waived indictment and pled guilty, pursuant to a cooperation agreement, to a ten-count information charging him with (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) wire fraud conspiracy, in violation of 18 U.S.C. § 1349; (3) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); (4) six counts of tax evasion, in violation of 26 U.S.C. § 7201; and (5) willful failure to file a report of foreign bank and financial accounts, in violation of 31 U.S.C. §§ 5314 and 5332(b).  The charges arose from Blazer's involvement in bribery and kickback schemes relating to, among other things, voting for the host of the 1998 and 2010 World Cups and Blazer's serial

tax evasion.  The docket sheet, information, plea transcript, cooperation agreement, and minute

entry of the proceeding remained sealed for roughly the next year and a half, while Blazer

assisted the government in a larger investigation.

On May 20, 2015, a grand jury in the Eastern District of New York returned a 47-count

indictment charging 14 defendants with racketeering, money laundering, and wire fraud

conspiracies, among other offenses, in connection with a decade-long scheme to corrupt

international soccer.  See United States v. Webb, No. 15-CR-252 (RJD).  On May 27, 2015,

contemporaneously with the unsealing of the indictment in Webb, the Court ordered the

unsealing of the information to which Blazer pled guilty, the order of forfeiture entered in

connection with his plea, and the minute entry reflecting his plea.  See ECF Nos. 2, 4, 5.  On

May 28, 2015, several news organizations filed a motion to unseal Blazer's plea proceeding.  See

ECF No. 14.  On May 29, 2015, the government and defendant jointly opposed the motion,

proposing instead to unseal a modified version of the transcript with redactions to cover all

references to Blazer's cooperation with the government.  See ECF No. 18.  For the reasons set

forth in the government's sealed submission, the Court ordered partial unsealing, and on June 3,

2015, the government publicly filed the redacted plea transcript.  See ECF Nos. 15, 19.

Long before the unsealing of portions of Blazer's case, the press reported on his

cooperation with an investigation into international soccer.  For example, on November 1, 2014,

the New York Daily News ran an article documenting the "inside story of how Chuck Blazer . . .

became a confidential informant for the FBI."[1]  According to the article, federal agents arrested

Blazer in 2011 for failing to pay income taxes and told him, "We can take you away in handcuffs

now—or you can cooperate."  Based on interviews and a review of non-public documents, the

---

[1] Teri Thompson, et al., Soccer Rat! The Inside Story of How Chuck Blazer, Ex-U.S. Soccer Executive and FIFA Bigwig, Became a Confidential Informant for the FBI, N.Y. Daily News, Nov. 1, 2014.

*Daily News* reported that beginning in 2011 "the feds flipped . . . Blazer, who at the behest of the FBI and IRS discreetly placed his keychain—a tiny microphone embedded in its specially altered fob—on nearby tables as a parade of international figures visited Blazer at various venues, including the London Olympics."  "Before traveling to the London games . . . Blazer emailed Russian, Hungarian, Australian and American soccer officials to arrange meetings the fed wanted him to secretly record."  The *Daily News* names some of these soccer officials in the article, and in one case quotes from an e-mail from one of the officials.  When the article was released, the FBI, IRS and U.S. Attorney's Office declined to comment.

The day Blazer's case was unsealed, the press again reported on Blazer's cooperation with law enforcement.  On May 27, 2015, the *Los Angeles Times* reported that "[t]he U.S. Justice Department's decision to charge nine high-ranking FIFA officials . . . may never have happened if not for the cooperation of Chuck Blazer," who had been "secretly taping" conversation with FIFA officials.[2]  The same day, a number of articles, citing the *Daily News* report, detailed Blazer's cooperation with the FBI.[3]  A day later, citing "a law enforcement source," the *Washington Post* also reported that "Blazer cooperated with the federal investigation and agreed to wear a wire . . . helping the government build its case against other FIFA officials and executives with sports marketing companies in the United States and Brazil."[4]

After the redacted transcript of Blazer's plea was unsealed, the *New York Times* provided further information about Blazer's cooperation:

---

[2] Kevin Baxter, <u>FIFA Indictments: Chuck Blazer Secret Recordings at Heart of Probe</u>, Los Angeles Times, May 27, 2015.

[3] <u>See</u>, <u>e.g.</u>, Alex Baker, <u>Meet the American Informant in the FBI's Investigation of FIFA Corruption</u>, Yahoo Sports, May 27, 2015, http://sports.yahoo.com/blogs/soccer-fc-yahoo/meet-the-american-informant-in-the-fbi-s-investigation-of-fifa-corruption-230450852.html.

[4] Will Hobson & Sari Horwitz, <u>American Helped Build Case Against FIFA Officials</u>, The Washington Post, May 28, 2015.

> Mr. Blazer became a cooperating witness, law enforcement officials said, although in the redacted version of the plea hearing . . . there were no references to Mr. Blazer's cooperating with the government.  However, law enforcement officials said that part of Mr. Blazer's cooperation deal had included secretly recording conversations. . . .
>
> There are at least two other cooperating witnesses in the FIFA case that suggest the kind of agreement Mr. Blazer may have struck. They are Daryan and Daryll Warner. . . .
>
> When each of the Warner sons secretly pleaded guilty in 2013, the judge outlined their cooperation agreements with the government. They agreed to participate in undercover activities, hand over documents, regularly meet with prosecutors, testify when requested, and not divulge their cooperation to anyone without the express permission of prosecutors.
>
> In return, prosecutors said, they would file a letter at sentencing noting each defendant's cooperation and asking for a departure from sentencing guidelines. Prosecutors often suggest little or no prison time in return for cooperation.[5]

A number of other news agencies have also cited to unnamed "law enforcement officials" about the nature of Blazer's cooperation with the government.[6]  According to the government, interest in Blazer's role has been so intense that on May 27, 2015, after this case was unsealed, a reporter entered Blazer's hospital room and attempted to question him.[7]

  With so much interest for the press, perhaps not surprisingly, on June 4, 2015, the New York Times made an application to unseal Blazer's plea agreement.  See ECF No. 20.  On June 5, 2015, the American Broadcasting Companies, Inc., Daily News, L.P., Newsday LLC, and Bloomberg L.P. joined in this application.  See ECF No. 22.  The government opposes the instant application by sealed letter dated June 9, 2015.

---

[5] Stephanie Clifford, Ex-FIFA Official Chuck Blazer Admitted Accepting Bribes for World Cup Votes, The New York Times, June 3, 2015, http://www.nytimes.com/2015/06/04/sports/soccer/soccer-official-chuck-blazer-admitted-accepting-bribes-for-world-cup-votes.html.

[6] See, e.g., Steve Almasy, Chuck Blazer: Soccer Bigwig Turned Informant, CNN, June 5, 2015, http://edition.cnn.com/2015/05/28/football/who-is-chuck-blazer/; Agence France-Presse (AFP), U.S. Official Says More FIFA Indictments Likely, May 30, 2015, http://www.msn.com/en-sg/news/other/us-official-says-more-fifa-indictments-likely/ar-BBkpkJr.

[7] As was noted on the record during Blazer's plea proceeding, he suffers from a number of serious physical ailments that have recently required hospitalization.

DISCUSSION

A.  Legal Standard

In deciding whether to unseal the documents, the Court is called upon to consider two clearly legitimate and competing concerns.  It is well established that the public and press have a common law and First Amendment "right of access to plea hearings and to plea agreements." United States v. Haller, 837 F.2d 84, 86-87 (2d Cir. 1988); see also United States v. Alcantara, 396 F.3d 189, 196 (2d Cir. 2005) (quoting Washington Post v. Robinson, 935 F.2d 282, 288 (D.C. Cir. 1991)) ("plea agreements have traditionally been open to the public, and public access to them enhances both the basic fairness of the criminal [proceeding] and the appearance of fairness so essential to public confidence in the system").  The right is grounded in the notion that "the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud" and provides "the public with a more complete understanding of the judicial system and a better perception of its fairness." Gambale v. Deutsche Bank AG, 377 F.3d 133, 140 (2d Cir. 2004) (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)).

On the other hand, this right of access is a "qualified" one that may be overcome where the Court makes "specific, on the record findings . . . demonstrating that closure [or sealing] is essential to preserve higher values and is narrowly tailored to serve that interest."  Alcantara, 396 F.3d at 199 (quoting Haller, 837 F.2d at 87, quoting Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13-14 (1986)).  The Second Circuit has attempted to reconcile these two competing interests by setting forth a four-prong test:

> First, the district court must determine, in specific findings made on the record, if there is a substantial probability of prejudice to a compelling interest of the defendant, government, or third party, which closure would prevent.  Compelling interests may include the defendant's right to a fair trial, privacy interests of the defendant, victims or other persons, the integrity of significant government

activities entitled to confidentiality, such as ongoing undercover investigations or detection devices, and danger to persons or property. Second, if a substantial probability of prejudice is found, the district court must consider whether reasonable alternatives to closure cannot adequately protect the compelling interest that would be prejudiced by public access. Third, if such alternatives are found wanting, the district court should determine whether, under the circumstances of the case, the prejudice to the compelling interest overrides the qualified First Amendment right of access. Fourth, if the court finds that closure is warranted, it should devise a closure order that, while not necessarily the least restrictive means available to protect the endangered interest, is narrowly tailored to that purpose.

United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995) (internal citations, quotation marks and punctuation marks omitted). The party moving to seal a document (or to maintain it under seal) bears the burden of establishing that sealing is warranted.

While the relevant law is reasonably clear, application of the relevant principles is not always so straightforward. As I have previously expressed, "the exercise is particularly troublesome when, as so often is the case, a misjudgment may have very grave consequences." United States v. Zazi, No. 09-CR-663 (RJD), 2010 WL 2710605, at *3 (E.D.N.Y. June 30, 2010). Also relevant is the government's representation that Blazer's plea agreement will not be sealed indefinitely, but only until, in the prosecution's view, the danger has passed.

B. Analysis

The question is whether the government has met its burden of establishing that public disclosure of Blazer's cooperation would create a substantial probability of prejudice to one or more of the compelling interests of the government such that the public's and media's right of access must give way to protect these interests. The government contends that disclosure of Blazer's cooperation agreement—and in so doing confirming that he is cooperating—would lead to a substantial probability of prejudice to two compelling interests. First, the government argues that public confirmation of Blazer's cooperation would prejudice the government's ongoing investigation by alerting targets of the investigation to the scope and nature of the government's

6

evidence, perhaps inviting flight or obstructive conduct.  Second, the government argues that release of Blazer's cooperation agreement would jeopardize his safety in light of the resources of the charged defendants, the intensity of media scrutiny, and Blazer's vulnerability as a patient receiving medical care.

Despite these proffered interests, the Court concludes that the government has not met its heavy burden of establishing that sealing remains warranted.  To be sure, the government advances interests that courts have recognized, in other circumstances, to be sufficiently compelling to justify sealing.  And here, while the government's dire predictions may be hyperbolic, they are not unreasonable or farfetched.  However, I simply cannot conclude that disclosure of Blazer's cooperation agreement would result in a substantial prejudice to these interests, particularly in light of the extensive amount of information already in the public domain and repeatedly attributed to law enforcement sources.

While the government is correct that, as a general rule, unsealing is not required merely on the basis of "press speculation," the information in numerous newspaper articles is far from guesswork.  The press has reported on (1) when Blazer began cooperating, (2) what prompted him to cooperate, (3) his use of a wired keychain to record conversations, (4) some of the officials that the government asked Blazer to target, (5) subjects of recorded conversations, (6) the centrality of Blazer's cooperation to the government investigation, and (7) some of the particulars of his cooperation agreement.  These news reports have not been based on mere guesswork, but on unnamed law enforcement sources and the review of documents.  These stories, coupled with reasonable inferences that can be drawn from the government's refusal to unseal Blazer's plea agreement, "have turned speculation and assumption into purported fact in an environment of heated interest and seemingly insatiable and understandable curiosity."  Zazi, 2010 WL 2710605, at *3.

7

While the Court does not challenge the general suggestion that confirmation of a defendant's cooperation may in a given case seriously undermine the efforts of law enforcement to protect the community, build its case, and harvest valuable intelligence, the Court does not see—and the government does not convincingly explain—how or why "confirmation" of Blazer's cooperation would lead his co-conspirators to so dramatically change their behavior so that a substantial prejudice to the government might result.  I have, of course, read Blazer's cooperation agreement, and there is nothing in there that is particularly illuminating about the nature or scope of Blazer's cooperation.  The agreement does not, for instance, spell out the government's targets or theory of the case.

Based on the tremendous amount of press, the Court finds it most reasonable to conclude that defendants and at-large co-conspirators will not wait for official "confirmation" before choosing to abscond or obstruct.  Disclosure of Blazer's cooperation agreement will be of little consequence to the government's effort to build a case.  Likewise, I am puzzled by the suggestion that disclosure of the cooperation agreement will pose a heightened safety risk to Blazer.  There is nothing in the cooperation agreement that reveals Blazer's current location, and for those individuals bent of seeking Blazer out, I cannot imagine that disclosure of the agreement will make much of a difference.

The Court does not reach this decision lightly.  In most circumstances courts are not prognosticators, and, as evidenced by my May 28, 2015, order denying complete unsealing of the plea transcript, this Court is sensitive to the government's concerns.  Ultimately, however, the "right of access is the rule, and it is a rare and exceptional case where it does not apply."  United States v. Cojab, 996 F.2d 1404, 1407 (2d Cir. 1993).  The public's interest has been piqued, and further sealing will not stem the tide of speculation.  The nature of Blazer's cooperation—at least to the extent expressed in his cooperation agreement—should be removed from the shadows.

8

<u>CONCLUSION</u>

For the foregoing reasons, the application to unseal Blazer's plea agreement is granted. This order is stayed until June 15, 2015, at which point the government must either post a copy of the agreement to the case docket or indicate its intention to appeal this order.  If the government appeals, this order is stayed pending appeal.  Any application by the government to redact any portion of the agreement before docketing must be made by the end of the day on June 12, 2015.

SO ORDERED.

Dated:  Brooklyn, New York
          June 11, 2015

                                        /s/ Judge Raymond J. Dearie
                                        _____
                                        RAYMOND J. DEARIE
                                        United States District Judge